Slip Op. 01 - 92

# *UNITED STATES COURT OF INTERNATIONAL TRADE*

|  |  |  |
|---|---|---|
| AUSIMONT SPA and AUSIMONT USA, | : | |
| | : | |
| Plaintiffs, | : | **PUBLIC VERSION** |
| | : | |
| v | : | **Before: MUSGRAVE, JUDGE** |
| | : | |
| THE UNITED STATES, | : | Court No. 98-10-03063 |
| | : | |
| Defendant, | : | |
| | : | |
| E.I. DUPONT DE NEMOURS, | : | |
| | : | |
| Defendant-Intervenor. | : | |
| | : | |

[Plaintiffs' motion for judgment upon the agency record granted in part, denied in part, and remanded to Commerce.]

Dated: August 2, 2001

*MRC Inc.* (*John Hoellen*), Washington, D.C., for plaintiffs.

*Stuart E. Schiffer*, Acting Assistant Attorney General; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Lucius B. Lau*), for defendant.

*Wilmer Cutler & Pickering* (*Ronald I. Meltzer, John D. Greenwald, Francesca E. Bignami*, and *Christopher J. Kent*), Washington, D.C., for defendant-intervenor.

## OPINION

Plaintiffs Ausimont SpA and Ausimont USA ("Ausimont") move for Rule 56.2 judgment upon the agency record for the August 1, 1996 through July 31, 1997 review period ("POR") compiled by the International Trade Administration, United States Department of Commerce ("Commerce") *sub nom. Granular Polytetraflouroethylene Resin From Italy*: *Final Results of Antidumping Duty Administrative Review*, 63 Fed. Reg. 49080 (Sep. 14, 1998) ("*Final Results*".)

The Defendant United States (the "government") and the Defendant-Intervenor E.I. DuPont de Nemours ("DuPont") urge that the *Final Results* be sustained as published.

Two issues are presented for consideration: (1) whether the "normal value"[1] ("NV") of the subject merchandise was based on home market sales which were made outside the ordinary course of trade or not in the usual commercial quantities, and (2) whether it was improper not to include imputed credit expenses and inventory carrying costs in the denominator of the constructed export price ("CEP") profit allocation ratio ("CEP profit"). The first issue requires remand for further proceedings not inconsistent with this opinion. Commerce's treatment of CEP profit is sustained.

### *Background*

Since 1988, Ausimont USA has imported polytetraflouroethylene ("PTFE") subject to *Granular Polytetraflouroethylene Resin From Italy: Antidumping Duty Order*, 53 Fed. Reg. 33163 (Aug. 30, 1988). In 1993, Commerce determined that "wet reactor bead" constituted "imported parts and components" of granular PTFE resin and that the value-added difference in transforming the one into the other was "small" and that therefore the outstanding order encompassed wet reactor bead. *Granular Polytetraflouroethylene Resin From Italy: Final Affirmative Determination of Circumvention of Antidumping Duty Order*, 58 Fed. Reg. 26100 (Apr. 30, 1993) ("*Circumvention*

---

[1] "Normal value" is "the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price." 19 U.S.C. § 1677b(a)(1)(B)(i) (1994). "Foreign like product" is merchandise which is produced in the same country and by the same person and which is identical in physical characteristics to the subject merchandise or is "like" subject merchandise in component material and in purposes used, and either approximates equal commercial value of subject merchandise or is reasonably determined, by Commerce, to be comparable to subject merchandise. 19 U.S.C. § 1677(16) (1994).

*Determination*".)  *See* 19 U.S.C. § 1677j (1988).  That determination was sustained in *Ausimont v.*

*United States*, 19 CIT 151, 882 F. Supp. 1087 (1995).

The instant POR was publicly initiated[2] on September 25, 1997 via a questionnaire issued

to Ausimont SpA containing a glossary which read in part: "[i]n calculating [NV], the Department

will consider only those sales in the comparison market that are . . . made under conditions and

practices that, for a reasonable period of time prior to the date of sale of the subject merchandise,

have been normal for sales of the foreign like product."  Letter with Questionnaire from Commerce

to Ausimont of 9/24/97 app. I at 10 (PDoc 3, Fiche 4, Fr. 19).  *See* Def's[3] PubApp 3 at app. I.

Ausimont responded on November 6, 1997 with "diskettes and printouts . . . contain[ing] a sale-by-

sale listing of all virgin and filled PTFE granular resin, plus wet reactor bead, sold in Italy during the

period" and explanation: that granular PTFE resin is sold in a polyethylene-lined drum and "wet

reactor bead is sold in a bag"; that all of Ausimont SpA's customers constituted "one class of

customers only – unrelated fabricators who transform granular PTFE resin into semifinished and

finished manufactured products"; and that there was "one channel of distribution only – shipment

of orders directly from Ausimont's plant or warehouse to the customers" on a "delivered basis" via

unrelated common carrier.  Letter with Questionnaire Response from Ausimont to Commerce of

---

[2]  62 Fed. Reg. 50292 (Sep. 25, 1997).  *See* 19 CFR 351.215(b) (1997).  Administrative review assesses the amount by which the home market NV of subject merchandise exceeds its "export price" ("EP") or, if circumstances warrant, its CEP and establishes the deposit rate for future entries.  *See generally* 19 U.S.C. §§ 1675(a)(2)(A) and (C), 1677(35)(A), 1677a, 1677b (1994).

[3]  Ausimont and the government are abbreviated "Pls" and "Def" in references to their briefs. References to the public and confidential record information are to the official record ("PDoc" and "CDoc", respectively), as microfiched, with occasional references to public and confidential information as appended to the parties' briefs, denoted herein as "PubApp" and "ConfApp".

11/06/97 ("QR 1") (PDoc 13, Fiche 5, Frs. 1, 16, 26, 29, 32, 36, 38, 45; CDoc 1, Fiche 13, Frs. 1, 16, 26, 29, 32, 36, 38, 45). *See* Def.'s ConfApp 1.

On February 23, 1998, Commerce sent a supplemental questionnaire and matching instructions to Ausimont requiring that it

> note that . . . data is also required in the U.S. and comparison market sales listings for wet reactor bead products in both markets[, e]nsure that you have provided home market sales of all products that can be matched to reactor bead that is further manufactured in the United States[,] and provide a complete description of the home market products and sales that you believe are the most appropriate comparisons to [imported] wet reactor bead . . . .

Letter with Supplemental Questionnaire from Commerce to Ausimont of 2/23/98, Sec. A, 3-4 (PDoc 18, Fiche 8, Frs. 40, 43-44; CDoc 4, Fiche 19, Frs. 57, 60-61). *See* Def's ConfApp 2, Sec. A, 3-4. On March 16, 1998, Ausimont responded, in particular noting that the "appropriate home market reactor bead code is provided with each individual further-manufactured sales transaction in Ausimont's U.S. sales listing." Letter with Supplemental Questionnaire Response from Ausimont to Commerce of 3/16/98 ("QR 2") at "SQR-9" and "SQR-10" (PDoc 21, Fiche 9, Frs. 1, 20-21; CDoc 5, Fiche 20, Frs. 1, 20-21). *See* Def's ConfApp 3 at "SQR-9" and "SQR-10."

Commerce verified Ausimont's responses at the Bollate offices (Milano, Italy) over April 6-10, 1998. *See* Verification Memorandum of 5/4/98 (PDoc 28, Fiche 11, Fr. 14; CDoc 10, Fiche 22, Fr. 47); Def's ConfApp 5. The verification report notes correction of "a minor error in reporting the calculation of the packing costs for wet reactor bead for certain home market and U.S. sales" which had been submitted by Ausimont officials and describes discussion of wet reactor bead sales in general and a "pre-selected" sale of wet reactor bead in particular. *Id.* (PDoc 28, Fiche 11, Frs. 16, 23-24; CDoc 10, Fiche 22, Frs. 47, 56-57); Def's ConfApp 5 at 4, 8-9.

The preliminary analysis for the POR noted

> three sales transactions in the home market of wet reactor bead, comprising approximately 2.10 percent of the total quantity sold and 1.73 percent of the total value sold of the foreign like products. . . . [T]otal sales of further manufactured wet reactor bead in the U.S. market comprise more than [  ] percent (by volume and value) of all subject merchandise sales in the U.S. market.
>
> The size of the margin in these preliminary results is due, to a large extent, to the fact that the U.S. sales of further manufactured wet reactor bead have relatively a high cost of further manufacturing (*i.e.* on the average is approximately [  ] percent of the sales value), which, when deducted with the other charges and adjustments from the U.S. price, yields a substantially lower value than the foreign unit price of wet reactor bead sales in the home market. Our analysis of the company's sales data for both the U.S. and home markets shows that the average net U.S. unit price [of wet reactor bead] is approximately US$[    ]/lb., whereas the average wet reactor bead sale [price in the home market] is approximately US$[    ]/lb. We note that in the previous review, there were no sales in the home market of wet reactor bead, and all U.S. sales of further manufactured wet reactor bead were matched to the constructed value for such sales.

Analysis Memorandum of 5/4/98 (PDoc 29, Fiche 11, Frs. 42-43; CDoc 11, Fiche 22, Frs. 75-76); Def's ConfApp 6 at 1-2.

Commerce published its preliminary results on May 11, 1998, finding that NV exceeded CEP by 40.90 percent. *Granular Polytetraflouroethylene Resin From Italy*, 63 Fed. Reg. 25826 (May 11, 1998.) Ausimont objected, at this point contending *inter alia* that NV should not have been based on home market wet reactor bead sales since they had not been made in the ordinary course of trade or in the usual commercial quantities, and contending that the CEP profit ratio was faulty because imputed credit expenses and inventory carrying costs were included in the numerator but not in the denominator.

In the *Final Results*, Commerce rejected Ausimont's request to exclude the home market wet reactor bead sales on the ground that the case record was compiled without intimation that these sales had been made outside the ordinary course of trade until Ausimont filed its administrative case brief, and that Ausimont had not met its burden of proof "in light of this record evidence." 63 Fed. Reg. at 49081. Specifically, Commerce stated the general preference under 19 U.S.C. § 1677b(a)(1)(A) is to use home market sales of the foreign like product to determine NV if possible before resorting to constructed value ("CV"), that home market sales made outside the ordinary course of trade are to be excluded per 19 U.S.C. § 1677b(a)(1)(B)(i), and that cases including *Murata Mfg. Co. v. United States*, 17 CIT 259, 820 F. Supp. 603 (1993) place the burden of establishing extraordinary sales upon the claimant. *Id.*

Commerce stated that the relevant home market sales for price-based comparison to merchandise further manufactured after importation into the United States are those of products "identical or similar" to U.S. imports of subject merchandise, and that since U.S. further-manufactured sales involved imported wet reactor bead that was further processed into finished PTFE resin, the home market wet reactor bead sales were deemed relevant for that purpose. *Id.* Commerce then noted that Ausimont provided home market wet reactor bead sales in its initial home market sales listing without claiming inclusion or analysis thereof was inappropriate, that the supplemental questionnaire sent to Ausimont indicated the intent to use the reported home market wet reactor bead sales in the analysis, and that Ausimont's supplemental response, as with its initial response,

> made no claim that such home market sales were inappropriate for use in our analysis for any reason, much less that such sales were inappropriate

> specifically because they were made outside the ordinary course of trade. In fact, the plain language of Ausimont's response to our supplemental questionnaire clearly indicated the company's expectation that such sales would be used, and were appropriate for use, as price-based matches for U.S. further-processed sales of imported wet reactor bead. Thus, at no time during the information-gathering stage of this review did Ausimont provide any evidence, or make any claim, regarding the exclusion of such sales as outside the ordinary course of trade.

*Id*. Commerce further stated that it had indicated its intent to use home market wet reactor bead sales in its analysis prior to verification, and during verification Ausimont officials discussed in detail home market sales selected by Commerce for examination without raising the issue that such sales were extraordinary. *Id*. Therefore, "in the absence of information indicating that the relevant home market sales were inappropriate for use in our analysis" and finding a statutory preference for price-to-price matches, Commerce maintained that the home market wet reactor bead sales were the most appropriate basis for establishing NV for comparison with U.S. sales of imported wet reactor bead (as further-processed). *Id* at 49081-49082.

Commerce then considered the merits using the ordinary-course-of-trade analysis of *Canned Pineapple Fruit From Thailand*, 60 Fed. Reg. 29553 (June 5, 1995) (Final Determ. LTFV), *sustained sub nom. Thai Pineapple Public Co. v. United States*, 20 CIT 1312, 946 F. Supp. 11 (1996), *reversed on other grounds*,187 F.3d 1362 (Fed. Cir. 1999.) Commerce agreed that the volume and frequency of wet reactor bead sales in the home market represented small percentages of total sales but found that the absolute amounts were "not insignificant." *Final Results* at 49082. Considering that the quantities of wet reactor bead sold in the home market were larger on average than granular PTFE resin sales, Commerce maintained that (1) total sales and sales volume are not independently

dispositive of whether sales had been made in the ordinary course of trade,[4] (2) there was insufficient information on the record to determine whether the difference was attributable "to circumstances rendering the sales in question extraordinary or unrepresentative of normal sales," (3) the range of wet reactor bead and finished PTFE resin quantities did not indicate that the home market wet reactor bead sale quantities were "so unusual as to render such sales inappropriate for our analysis," and (4) "the fact that home market sales of wet reactor bead were made in quantities higher than average does not support a conclusion that [NV] based on the price of such sales would be unreasonably high." *Id.* at 49082. Based on these reasons and its reading of *Nachi-Fujikoshi Corp. v. United States*, 16 CIT 606, 608-609, 798 F. Supp. 716, 718-719 (1992), Commerce also rejected Ausimont's contention that the home market wet reactor bead sales were not "usual commercial quantities." *Id. See* 19 U.S.C. § 1677b(a)(1)(B).

Commerce then rejected Ausimont's comparison of the average selling price of wet reactor bead versus that of finished PTFE resin because "wet reactor bead is sold as an intermediate product, at prices we would expect to differ from those of finished PTFE resin." Similarly, Commerce rejected the comparison of profits because sales of "certain models" of granular PTFE resin showed higher profits than the home market wet reactor bead sales and also because high profits are not necessarily indicative of extraordinary sales. *Final Results* at 49082 (citation omitted).

Commerce also rejected the argument that there was no "market" for wet reactor bead in Italy because the contention "focuse[d] entirely on the immediately prior review, without addressing the

---

4 *Final Results* at 49082, referencing *Certain Welded Carbon Steel Standard Pipes and Tubes from India*, 56 Fed. Reg. 64753 (Dec. 12, 1991) (Final Rev. Results), and *Fresh Atlantic Salmon from Chile*, 63 Fed. Reg. 31411, 31423 (June 9, 1998) (Final Determ. LTFV).

fact that the respondent ha[d] in fact sold wet reactor bead in the home market in previous segments of this proceeding." *Id*., referencing Ausimont's Questionnaire Response of 2/13/95. Considering the differences in terms of sale, Commerce agreed with Ausimont that selected exhibits collected during verification showed that the terms of sale, for the wet reactor bead sales examined, differed from those of certain sales of finished PTFE resin but it stated that it had not examined or collected these exhibits for that purpose and that Ausimont officials had not discussed such differences at verification. Consequently, Commerce stated that it was "unable to conclude from these documents that the terms of sale involving wet reactor bead generally differed significantly from those of other sales of finished PTFE resin products or that different terms of sale are not generally applicable to all sales." *Id*. Lastly, Commerce found it significant that the home market sales of PTFE wet reactor bead were made to the same customer who also purchased finished PTFE resin products. *Id*. For these reasons, Commerce found that Ausimont "failed to explain the facts that establish the extraordinary circumstances rendering the claimed sales outside the ordinary course of trade" and that "the circumstances that would render home market sales of wet reactor bead outside the ordinary course of trade are not present in this review." *Id*. at 49082-49083.

In addition, the *Final Results* rejected Ausimont's claim that the preliminary results relied upon an incorrectly calculated CEP profit ratio. Commerce considered that the claim involved two aspects: whether to include imputed expenses in the total expenses used to calculate the ratio, and whether to include imputed expenses in the pool of U.S. selling expenses to which Commerce applies the ratio. *Id*. The *Final Results* state that Commerce followed "established" administrative practice to calculate the profit rate in accordance with the normal accounting practice which permits

deduction of actual booked expenses but not imputed expenses and then apply this rate to U.S. selling expenses which include imputed expenses consistent with 19 U.S.C. §§ 1677a(d) and 1677a(f). *Id*. at 49083-49084 (citation omitted.) The published margin of dumping was 45.72 percent for covered entries. *Id*. at 49084. Ausimont summonsed the government on October 14, 1998, complaining of this treatment of home market wet reactor bead sales and CEP profit (as well as improper rejection of a level-of-trade adjustment, a claim which has since been dropped.)

### *Standard of Review*

Jurisdiction is conferred by 28 U.S.C. § 1581(c). The question for the Court is whether the administrative determination is "unsupported by substantial evidence on the record or is otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994). This standard is considered "less deferential" than the arbitrary-and-capricious standard and allows "considerably more generous judicial review." *See American Paper Inst., Inc. v. American Elec. Power Serv. Corp.*, 461 U.S. 402, 412-13 n.7 (1983); *Abbott Labs v. Gardner*, 387 U.S. 136, 143 (1967). *See also In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000). The position is whether a reasonable fact finder could have arrived at the agency's decision in light of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. of New York, Inc. v. NLRB*, 305 U.S. 197, 229 (1938). *See also AK Steel Corp. v. United States*, 192 F.3d 1367, 1371 (Fed. Cir. 1999). This requires examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision, *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-88 (1951), but "the possibility of drawing two inconsistent conclusions from the evidence does

not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620 (1966).

## *Discussion*

### I

Ausimont's primary claim is that Commerce erred in considering three home market wet reactor bead sales as made within the ordinary course of trade (the "contested sales".)

### A

As a preliminary matter, the government and DuPont argue it is inappropriate to address the merits because Ausimont first raised its claim after the preliminary review results were published. They contend that the argument is belated, akin to a failure to exhaust administrative remedies. Def's Resp. at 25-30, referencing *United States v. L.A. Tucker Lines, Inc.*, 344 U.S. 33, 37 (1952), *Finnigan Corp. v. International Trade Comm'n*, 180 F.3d 1354, 1362-1363 (Fed Cir. 1999), and *Sandvik Steel Co. v. United States*, 164 F.3d 596, 599 (Fed. Cir. 1998). The government points to the detail of regulations for antidumping duty administrative reviews, pursuant to which information must be submitted, verified (as necessary), preliminarily mustered, and briefed with "all arguments that *continue* in the submitter's view to be relevant to the Secretary's final determination or final results." *Id.*, quoting 19 C.F.R. § 351.309(c)(2) (government's emphasis.) *See* 19 C.F.R. §§ 351.301(b)(2), 351.307, 351.221(b)(4) (1997). In addition, the government asserts Commerce's consideration was "hampered" by an inability to develop a fuller factual record on the issue since it did not have sufficient time to consider and verify the claim. It argues, furthermore, that Ausimont's "affirmative statements" on the contested sales amounted to "waiv[ing] . . . any claim

it might have had that wet reactor bead sales were outside the ordinary course of trade" under the logic of *Finnigan*, *supra*. Def's Resp. at 27-30, referencing in addition *Murata Mfg. Co.*, *supra*, 17 CIT at 265, 820 F. Supp. at 607, *Fujitsu General Ltd. v. United States*, 19 CIT 359, 374, 883 F. Supp. 728, 739, *aff'd* 88 F.3d 1034 (Fed. Cir. 1996), and *Mukand, Ltd. v. United States*, Slip Op. 99-35, 1999 WL 342461 (Apr. 9, 1999).

Be that as it may,[5] if the argument here is one of exhaustion, that doctrine forecloses judicial review of issues not first presented to the agency for consideration but does not proscribe review where an issue was actually considered. *United States v. L.A. Tucker Truck Lines, Inc.*, *supra*; *Rhone Poulenc, Inc. v. United States*, 13 CIT 239, 710 F. Supp. 348 (1989), *aff'd* 899 F.2d 1185 (1990). If the argument is one of timeliness, Ausimont's raised its points not two weeks but more than three months prior to issuance of the *Final Results*, and there was apparently sufficient time to consider data pertaining to not only the instant POR but prior reviews as well. *Cf.* 19 U.S.C. § 1677m(e) (1994). For that matter, the mere provision of comparison market sales data at the fact-gathering stage in response to agency request does not, as a consequence, render such sales ordinary. *Cf. NTN Bearing Corp. of America v. United States*, 19 CIT 1221, 1229, 905 F. Supp. 1083, 1090-91 (1995). A claimant must prove the circumstances which render sales extraordinary, *e.g. Koyo Seiko Co., Ltd.*

---

[5] *Finnigan* found appellate-level argument favoring a particular construction of a patent claim had not been "specifically" asserted to the International Trade Commission and was therefore waived in the wake of an administrative law judge's determination. *Mukand* sustained Commerce's disregard of untimely "statements of fact in support of allegations". *Fujitsu* justified rejecting a level-of-trade-adjustment claim not only because it was untimely raised, two weeks prior to a hearing thereon, but also because the questionnaire had specifically requested a statement of such claim (if any) and provision of supporting documentation therefor. The respondent had provided neither. *See Television Receivers, Monochrome and Color, From Japan*, 56 Fed. Reg. 5392, 5392 at Comment 17 (Feb. 11, 1991) (Final Rev. Results).

*v. United States*, 20 CIT 772, 783-84, 932 F. Supp. 1488, 1497-98, (1996); *Nachi-Fujikoshi Corp.*,

*supra*, 16 CIT at 608-609, 798 F. Supp. at 718-719, and executing *volte face* certainly would *not*

alleviate the burden of persuasion, however there is no presumption that sales are ordinary, *see*

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27296, 27299 (May 19, 1997) (Final

Rule), and facts might speak for themselves.  Further imperatives followed Ausimont's first

questionnaire response[6], but in the end Commerce had a duty, as implied in the matching instructions

sent to Ausimont with the first questionnaire, to "consider only those sales in the comparison market

that are . . . made under conditions and practices that, for a reasonable period of time prior to the date

of sale of the subject merchandise, have been normal for sales of the foreign like product."  Letter

with Questionnaire from Commerce to Ausimont of 9/24/97 app. I at 10 (PDoc 3, Fiche 4, Fr. 19).

*See* Def's PubApp 3, app. I at 10.  Otherwise, authority to exclude sales on Commerce's own

initiative is lacking.

**B**

For the POR, U.S. sales of granular PTFE resin comprised [     ] percent by volume, [     ]

percent by value, and [     ] percent by number of transactions ([     ] sales out of [      ] total sales

of subject  merchandise and  foreign like product), whereas the contested sales comprised  2.0

percent of home market sales by volume, 1.7 percent by value, and 0.4 percent by number of

---

[6] *Inter alia*, Ausimont was directed to "make the following revisions to the U.S. and comparison market sales databases", which included instruction to "Confirm," "Include," "Assume," "continue to report" *et cetera*, and also "Please note that the [foregoing] data *is also required* in the U.S. and comparison market sales listings for wet reactor bead products in both markets. *Ensure that you have provided home market sales of all products that can be matched to reactor bead* that is further manufactured in the United States . . . ."  Letter with Supplemental Questionnaire from Commerce to Ausimont of 2/23/98 (PDoc 18, Fiche 8, Frs. 43-44; CDoc 4, Fiche 19, Frs. 59-60) (highlighting added).  *See* Def's ConfApp 2 (Section A, pp. 2-3).

transactions. The contested sales were sold to one of Ausimont's customers, all of whom were "fabricators" at the time, on a "pending" order basis which gave Ausimont discretion to cancel if an order could not be filled by a specified target date. By contrast, there were [    ] home-market sales of granular PTFE resin purchased by [    ] customers with quantities and prices subject to change until shipment or, occasionally, on an "open order" basis as to quantity and price terms, meaning that the customer intends to order a particular product in the future.[7] The contested sales averaged over five times the quantity,  21.3 percent lower prices, and nearly two times higher profits, than average sales of granular PTFE resin, and accounted for more than 72 percent of the margin of dumping, according to Ausimont.

*1. The Plaintiffs' Arguments*.

Ausimont contends Commerce did not properly consider the "totality of the circumstances" of the contested sales on volume, frequency, prices, quantities, profits, market, terms and conditions, and customers, and in light of *Thai Pineapple Public Co. v. United States*, 20 CIT 1312, 946 F. Supp. 11 (1996).[8] Pls' Br. at 12-14, 33, referencing Pls' ConfApps 2, 5, 6. Specifically, it argues

---

[7] QR 1 at A-10-11 (PDoc 13, Fiche 5, Frs. 20-21; CDoc 1, Fiche 13, Frs. 20-21).

[8] In *Thai Pineapple Public Co. v. United States*, 20 CIT 1312, 946 F. Supp. 11 (1996), *rev'd on other grounds*, 187 F.3d 1362 (Fed. Cir. 1999), a single sale comprising 0.01 percent by volume of the respondent's foreign market database was compared to two United States sales amounting to one percent by volume of the U.S. sales database. The comparison accounted for 90 percent of the preliminary dumping margin. Commerce considering the record for volume, frequency, quantity, price, profits, market demand, number and type of customers, and terms of sale, and concluded that except for type of customer and terms of sale the facts supported exclusion. *See* 20 CIT at 1315-1316, 946 F. Supp. at 16. Ausimont points out that Commerce has also recognized that overrun sale analysis (*e.g.*, volume, price, profit, physical differences, end-uses, number of customers,) is useful in evaluating non-overrun sales. Pls' Supp. Mem. at 8. *See Laclede Steel Co. v. United States*, 19 CIT 1076 (1995); *Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products From Korea*, 64 Fed. Reg. 12927, 12941 (Mar. 16, 1999) (Final Rev. Results).

Commerce should have (1) considered wet reactor bead distinct from granular PTFE resin, since both are types of PTFE and wet reactor bead is not a model of granular PTFE resin, (2) accorded heavier weight to volume and frequency, (3) compared quantities, profits and prices based on aggregate averages, and (4) considered in a fuller light the "market" for wet reactor bead in Italy and the contested sales' different terms of trade and usage as compared with granular PTFE resin.

Ausimont argues that the ordinary-course-of-trade statute, 19 U.S.C. § 1677(15), requires Commerce to examine "the conditions and practices which . . . have been normal in the trade under consideration with respect to merchandise of the same class or kind" and it argues the proper comparison here is between two *types* of PTFE – wet reactor bead and granular PTFE resin–and not between wet reactor bead and certain "models" of granular PTFE resin.[9] Pls' Supp. Mem. at 4, referencing *Certain Welded Carbon Steel Standard Pipes and Tubes from India*, 56 Fed. Reg. 64753 (Dec. 12, 1991) (Final Rev. Results) ("*Pipes From India*").[10] *Accord Mantex Inc. v, United States*, 17 CIT 1385, 1404, 841 F. Supp. 1290, 1306 (1993). It states Commerce has distinguished clinker

---

[9] The antidumping duty order originally circumscribed only "granular PTFE resin." *See Granular Polytetraflouroethylene Resin From Italy*, 53 Fed. Reg. 26096 (July 11, 1988) (Final Determ. LTFV). All models thereof were determined to constitute a single class or kind of merchandise.

[10] *Pipes From India* covered "shipments of welded carbon steel pipes and tubes with an outside diameter of 0.375 inch or more but not over 16 inches." 56 Fed. Reg. at 64753. The issue was whether sales in India of pipe meeting American Society for Testing Materials specification A-120 ("ASTM pipe") were within the ordinary course of trade. After comparing differences between ASTM pipe and Indian Standard IS-1239 pipe based on (1) volume, (2) number of buyers, (3) standards and product use, (4) price, (5) profit, and (6) production runs (*i.e.* overruns or seconds), Commerce determined the ASTM pipe sales to have been outside the ordinary course of trade. Commerce also applied difference-in-merchandise adjustments to the several "such or similar" categories of IS pipe in accordance with 19 U.S.C. § 1677b(a)(4)(C). *See Certain Welded Carbon Steel Standard Pipes From India,* 56 Fed. Reg. 26650, 26651 (June 10, 1991) (Preliminary Results).

and cement as separate foreign like products, *see Calcium Aluminate Cement, Cement Clinker and Flux From France*, 59 Fed. Reg. 14136, 14141 (Mar. 25, 1994) (Final Determ. LTFV), and it argues that wet reactor bead is to granular PTFE resin as clinker is to cement. Pls' Supp. Mem. at 5-9.

On its second point, Ausimont argues volume and frequency are necessary precursors to "heightened scrutiny" of other ordinary-course-of-trade factors and therefore are, or should be, accorded "great weight" in the analysis. Pls' Br. at 12-14 referencing *CEMEX S.A. v. United States*, 19 CIT 587, 589-93 (1995), *aff'd after remand results sustained* 133 F.3d 897, 903 (Fed. Cir. 1998) and *Mantex Inc. v. United States*, *supra*, 17 CIT at 1404, 841 F. Supp. at 1306 (1993).[11] Out of [     ] kilograms of foreign like product sold in Italy, the absolute amount of the contested sales was [     ] kilograms. Ausimont argues that even this overstates because wet reactor bead was sold in 700-kilogram "bags" containing 30 percent water, useless "initiator residues," and organic contaminants, whereas granular PTFE resin is packed dry and sold in drums weighing at most 45 kilograms. Pls' Br. at 14. *Cf.* note 26, *infra.* The volume and frequency of the contested sales were determined small, but "not insignificant" because "the quantities involved in these sales are in fact larger on average than for other sales." *Final Results* at 49082. Ausimont argues that this was arbitrary since it offers no indication of what standard was applied, and for that matter whatever standard was used was not applied consistently since Commerce on its own initiative and without explanation determined seven home market sales of a model of granular PTFE resin were outside

---

[11] *CEMEX S.A. v. United States*, 19 CIT 587, (1995), *aff'd after remand results sustained* 133 F.3d 897 (Fed. Cir. 1998) sustained the determination that home market sales of certain types of cement were extraordinary based on analysis of (1) volume, (2) sales patterns, (3) home market demand,(4) shipping arrangements and allocation of shipping costs, (5) profitability, and (6) corporate image, *i.e.* the "promotional quality" of the sales. *Mantex* sustained *Pipes From India*.

the ordinary course of trade although the absolute quantity of these sales, sold to three customers

in Italy, was [        ] kilograms.[12]  The only agency determination to reject an ordinary course of

trade claim based on the "significance" of an absolute volume amount, according to Ausimont, was

*Fresh Atlantic Salmon From Chile*, 63 Fed. Reg. 31411, 31423 (June 9, 1998) (Final Determ. LTFV)

("*Fresh Atlantic Salmon*"), which also determined those sales to have been "regularly sold

throughout" the period of investigation.[13]  Ausimont states it may therefore be inferred that their

frequency was "*not* small," in contrast to the determination on that issue here, and it notes that

neither the government nor DuPont pointed to a proceeding in which an ordinary course of trade

claim was rejected in the presence of both small volume *and* small frequency.  Ausimont states that

Commerce has considered small volume and frequency arguably dispositive in their own right for

determining sales extraordinary,[14] and while Ausimont concedes that other considerations may

---

[12]  Pls' Rep. at 20.  *See* line 116 of Commerce's Final AD Administrative Review computer program log which reads "IF TYPEH=. OR FILLERH=. ORFILLPCTH=. OR GRADEH=. THEN OUTPUT OFFSPECH;".  This apparently served to output seven sales of product code [        ] as outside the ordinary course of trade.  None of the parties address the reason why.  Total volume and frequency of product code [        ] were greater than the contested sales, *i.e.* 3.0% and 0.9% of total merchandise sold (excluding contested sales).  The average quantity of product code [        ] was 64% of the average quantity of the contested sales.

[13]  *See Fresh Atlantic Salmon*, *supra*, 63 Fed. Reg. at 31423 ("While sales of vacuum-packed fillets may represent a small percentage of total sales, the absolute amount of these sales [*i.e.* several thousand kilograms] is not insignificant".)

[14]  Following briefing, Ausimont submitted reference to *Gray Portland Cement and Clinker from Mexico*, 65 Fed. Reg. 13943 (Mar. 15, 2000) (Final Rev. Results) as Commerce's recent treatment of the matter, along with a motion to submit.  The government and DuPont argued against such submission and in addition addressed its substantive impact.  Commerce therein opined that examination of the volume and frequency of cement produced as Type V LA *alone* indicated that home market sales had been "unusual." *See* Decision Memorandum, A-201-802, ARP 97-98 (Mar. 15, 2000), available at http://ia.ita.doc.gov/frn/summary/2000mar.htm.  The parties' assistance on agency treatment of frequency and volume is helpful, and the motion to submit is therefore granted.

outweigh the presence of infrequent and low-volume sales, it maintains that none were present in

the *Final Results*.

On its third point, Ausimont argues that the government's rejection of its contention as

"incomplete explanation" amounts to mere rationalization because *Thai Pineapple Public Co.* and

the underlying determination looked only to variable differentiation. Pls' Br. at 15; Pls' Rep. at 15,

18. Ausimont argues Commerce offered insufficient or conflicting explanations to ignore or reject

comparisons of the contested sales to granular PTFE resin sales based on quantity, price, and profit.

It argues that the plain meaning of "normal" in the context of "merchandise of the same class or

kind" in 19 U.S.C. § 1677(15) is "average" or "typical," and it points out that Commerce has

typically examined ordinary-course-of-trade-claims by reference, *inter alia*, to average aggregate

quantifiable variables.[15] Ausimont therefore argues that only proof of quantities "significantly

---

[15] *See* Pls' Br. at 12, 27-29 referencing *CEMEX*, *supra*; *Mantex*, *supra. See also* Pls' Supp. Mem. at 11-15, referencing *Laclede Steel Co. v. United States*, 18 CIT 965, 968 (1994) *on remand*, *supra*, 19 CIT at 1080 (1995); *Gray Portland Cement and Cement Clinker From Mexico*, 64 Fed. Reg. 13148, 13156 (Mar. 17, 1999) (Final Rev. Results) *(see* Aug. 31, 1998 Memoranda at 4); *Certain Circular Welded Carbon Steel Pipes and Tubes From Thailand*, 61 Fed. Reg. 1328 (Jan. 19, 1996) (Final Rev. Results); *Canned Pineapple Fruit From Thailand*, *supra*, 60 Fed. Reg. 29553; *Granular Polytetraflouroethylene Resin From Japan*, 58 Fed. Reg. 50343, 50345 (Sep. 27, 1993) (Final Rev. Results); *Sulfur Dyes, Including Sulfur Vat Dyes, From The United Kingdom*, 58 Fed. Reg. 3253, 3256 (Jan. 8, 1993) (Final Determ. LTVF); *Circular Welded Non-Alloy Steel Pipe From the Republic of Korea*, 57 Fed. Reg. 42942, 42948 (Sep. 17, 1992) (Final Determ. LTFV). Ausimont asserts that Commerce previously gave notice of a preference for aggregate data for determining CV. Pls' Supp. Mem. at 15, referencing *Antidumping Duties; Countervailing Duties*, *supra*, 62 Fed. Reg. at 27359:

> The use of aggregate data results in a reasonable and practical measure of profit that the Department can apply consistently in each case. By contrast, a method based on varied groupings of foreign like products, each defined by a minimum set of matching criteria shaped with a particular model of the subject merchandise[,] would add an additional layer of complexity without generating more accurate results.

higher,"[16] prices "significantly lower,"[17] and profits "much higher,"[18] than those of the "vast majority" of granular PTFE resin sales, is all that should have been required to show that the contested sales were not made in the ordinary course of trade.

Ausimont further argues that the determinations in the *Final Results* on volume and quantity are inherently contradictory: the determination that the volume of the contested sales was "not insignificant" rests on the determination that their quantities were "larger on average than for other sales," yet quantities were determined not "so unusual as to render such sales inappropriate for our

---

[16] The contested sales weighed [                                                    ] (including the useless fluid and initiator residues) and averaged five times the average weight of granular PTFE resin sales. 13 sales of merchandise, about 1.8%, were in greater quantities than the average quantity of the contested sales, three of those were in greater quantities than two of the contested sales, and 46 sales, about 6.3%, were in greater quantities than the smallest contested sale, which would have been larger but for Ausimont's cancellation of part of the order. *See* Pls' Br. at 37.

[17] The average gross unit price of the contested sales was 21.3% lower than average home market PTFE granular resin sales. *See id*. at 30. Ausimont points out that during the POR there were only six other sales of the foreign like product in the home market with lower selling prices than the average gross unit price of the contested sales, and of those sales, Commerce, on its own initiative, excluded five as "off-spec product" and outside the ordinary course of trade, leaving only one with higher pricing than any sale of wet reactor bead. *Id*. at 31, referencing Pls' ConfApp 7; Pls' Rep. at 44-45. Eliminating these sales, Ausimont asserts that the average "normal" gross unit price on granular PTFE resin was 37% greater than the average gross unit price of the contested sales.

[18] Ausimont argues that Commerce's observation that [      ] "models" of PTFE granular resin had higher gross profit margins than those of the contested sales misses the point, since those model sales comprised only [   ]% of total sales volume whereas [    ]% had lower gross profit margins. Ausimont contends that profits were "abnormally" high by either a gross or net profit comparison: gross profit on the contested sales as a percentage of the total cost of production was over [   ]% but was under [   ]% for home market sales of PTFE granular resin; regarding net profit, the difference was [   ]% versus [   ]%. Pls' Br. at 26-27, referencing Pls' ConfApp 4 at 6 and Pls' ConfApp B. On a net profit basis, Ausimont contends only [   ] models of PTFE granular resin had "slightly higher" profit percentages than the contested sales, and those models comprised only [   ]% of the total sales of the merchandise by volume. *Id*. at 29. *See* Pls' ConApp B.

analysis" because of the range of "individual sales of both wet reactor bead and finished PTFE resin." *See Final Results* at 49082. Ausimont argues "Commerce cannot have it both ways:" if the absolute amount of the reactor bead sold is significant, then so is the fact that the average quantity of the contested sales is five times higher than that of granular PTFE resin sales, but if it is not significant that the average quantity of the contested sales is five times higher, then neither are their absolute amounts. Pls' Supp. Mem. at 17. Ausimont further argues that the reason given for rejecting the comparison of average prices in Italy for wet reactor bead and granular PTFE resin created an "impossible hurdle,"[19] *i.e.*, there were no "normal" home market sales of wet reactor bead with which the prices of the contested sales could be compared, and was implicitly at odds with the determination in the circumvention proceeding that the value added in the U.S. by further processing of wet reactor bead into granular PTFE resin is "small." Furthermore, Ausimont argues that to suggest that differences in prices and quantities are attributable solely to the fact that wet reactor bead is an intermediate product is to presume that it should be sold in higher quantities and at lower prices than those of the further-manufactured product. Ausimont argues quantities five times higher and prices 21.3 percent lower cannot be attributed solely to this "determination," because if the argument was true, it would only exacerbate the disparity in profits,[20] since it would likewise

---

[19] Pls' Br. at 32, referencing *NEC Home Electronics Ltd. v. United States*, 22 CIT 167, 3 F. Supp. 2d 1451 (1998) (requiring proof of sales when there were no such sales was unreasonable and abuse of discretion) and *Olympic Adhesives, Inc. v. United States*, 899 F.2d 1565, 1573 (Fed. Cir. 1990) (rejecting use of best information available in situation "where submitter cannot produce data because no such data ever existed".)

[20] "[A] profit level comparison is probative of the economic reality" of whether sales were within or without the ordinary course of trade. *Mantex*, *supra*, 17 CIT at 1406, 841 F. Supp. at 1308. Therefore "the disparity in profit margins is indicative of sales that were not in the ordinary course of trade." *CEMEX*, *supra*, 133 F.3d at 901.

have to presume profit *equality*.  Pls' Supp. Rep at 10-11.  Ausimont points out that since the

argument *presumes* a higher *per* sale quantity of wet reactor bead, it cannot be said that the

"absolute" amount of wet reactor bead sold was therefore a fact of significance in the determination

on volume and frequency.  In the event, Ausimont contends, the determinations on price, quantity,

frequency, and volume would become irrelevant, neither for its position nor held against it for lack

of proof.  Pls' Supp. Mem. at 10-11, referencing *Certain Circular Welded Carbon Steel Pipes and

Tubes From Thailand*, *supra*, 61 Fed. Reg. at 1331 ("not a requirement that different price and profit

levels be demonstrated in order for sales to be determined outside the ordinary course of trade.")

Commerce concluded there was a "market" in Italy for wet reactor bead "because Ausimont

has in fact made sales in prior segments of this proceeding."  Ausimont contends this is incorrect for

several reasons.  First, wet reactor bead is not listed as a product offered for sale on any of

Ausimont's sales literature.  Second, it is not "normally" sold to anyone other than Ausimont USA.

Third, the contested sales were purchased by only one of [     ] customers, all of whom were

previously verified as being "fabricators" who further processed granular PTFE resin into molded

shapes and mechanical parts,[21] *i.e.*, not in the business of making granular PTFE resin from wet raw

polymer.  Fourth, the uses of wet reactor bead are "extremely limited," since unlike granular PTFE

resin it cannot be directly compression molded into marketable shapes or forms.[22]  Fifth, sales cannot

---

[21] *See* Pls' Supp. Mem at 8, citing *Circumvention Determination*, *supra*, 58 Fed. Reg. 26100.

[22] Ausimont argues *Mantex*'s treatment of usage is instructive: Indian Standard ("IS") pipe sold in large numbers in India and in small numbers in the United States, whereas pipe manufactured according to the American Society for Testing and Materials ("ASTM") standards sold in small numbers in the India and in greater numbers in the United States.  ASTM pipe was unusual in the Indian market, therefore its uses in India were limited, therefore *a fortiori* demand in India would

(continued...)

be "representative" of the home market if there is no "market," and evidence of insignificant demand ought to be significant in the determination of that issue. *Id*. at 16-17, citing *Thai Pineapple Public Co.*, 20 CIT at 1314, 946 F. Supp. at 15; *Mantex*, 17 CIT at 1405, 841 F. Supp. at 1307. Ausimont contends that the *Final Results* stand in "stark contrast" to the circumvention investigation (in which Commerce determined two sales of wet reactor bead in Italy constituted "virtually no market")[23] and the reality of this POR, for which Commerce verified that there had been no home market sales

_____

[22] (...continued)
have been marginal. 17 CIT at 1405, 841 F. Supp. at 1307.

[23] *Circumvention Determination*, 58 Fed. Reg. at 26110. *See* Pls' Br. at 19. Ausimont also moves to supplement the administrative record, contending that Commerce relied on evidence from such prior proceedings to justify its conclusions but without considering the totality of that evidence which shows that there had been *no* market for wet reactor bead in the periods preceding the instant POR. Pls' Br. at 22, citing *F. Lli De Cecco Di Filippo Fara San Martino v. United States*, 21 CIT 1124, 1126-27, 980 F. Supp. 485, 487 (1997) (information was part of an agency record if it "was in front of [Commerce] during the investigation, regardless of whether or not [Commerce] chose to ignore it"); *Floral Trade Council of Davis, California v. United States*, 13 CIT 242, 243, 709 F. Supp. 229, 230 (1989) ("those documents at the agency which become sufficiently intertwined with the relevant inquiry are part of the record"). Ausimont contends that, in making its findings for the *Final Results*, Commerce ignored the fact that over the course of five consecutive years, since 1993 there had been only five sales of wet reactor bead to unaffiliated customers: two in the 1993-1994 period (the review in which Commerce determined that there was "virtually no market for wet reactor bead" and used CV therefor), and the three in this 1996-1997 POR. *Id*. at 23-24, referencing Pls' ConfApp A-1 and A-2. Ausimont argues Commerce also ignored Ausimont's report for that review on the average profit on home market sales of the class or kind of merchandise, which Commerce had requested and to which Ausimont had responded: "sales of [wet] reactor bead on the open market are not significant and do not reflect current market conditions" and that those "sales . . . were less than 1% of the total production," which Commerce accepted. *Id*. referencing Pls' ConfApp A-2. Ausimont argues Commerce here also ignored a printout for the 1994-1995 review period from the amended final determination disclosure materials listing the weighted-average home market values of all "models" of foreign like product showing no sales of wet reactor bead during that period. *See* Pls' ConfApp A-2. The Court has considered the government's and DuPont's opposition, and concludes that the *Final Results* opened the door to this inquiry and that therefore allowing Ausimont's motion would be proper and in accordance with 19 U.S.C. § 1516a(b)(2)(A)(i), *Floral Trade Counsel* and *F.LlI De Cecco Di Filippo Fara San Martino*. Since this is a "segment" of a "proceeding," it is arguable that the information is part of "the record" in any event.

during the 1995-1996 period. Pls' Br. at 18; Pls' Supp. Mem. at 9-10. Ausimont also emphasizes that Commerce agreed the volume and frequency of the contested sales were small in comparison with total sales of merchandise and that even where demand has been shown to exist sales have been excluded when the market was "so" small and the volume of sales "very" low.[24]

Regarding the terms and conditions of sale, the *Final Results* concluded that the verification documents did not indicate that the terms and conditions for the contested sales "generally differed significantly" from sales of granular PTFE resin "or that different terms [and conditions] of sale are not generally applicable to all sales." *Final Results*, 63 Fed. Reg. at 49082. Ausimont points out that wet reactor bead was neither described in any of the product brochures[25] nor listed or otherwise offered as a product for sale, there were no standard prices for wet reactor bead, and the prices of the contested sales were separately negotiated and reflect the dry weight sold.[26] Furthermore, sales canceled before invoice may be indicative of sales outside the ordinary course of trade, *see Murata Mfg. Co.*, *supra*, 17 CIT at 263, 820 F. Supp. at 606 (1993),[27] and Ausimont contends the documentation corroborates that the contested sales were on a "pending order" basis since at the bottom of the sales confirmation for OBS 81 is typewritten "*Si può spedire OK*" (translated thereon "It can be delivered") and Ausimont also cancelled three of the four orders in OBS 376 before

---

[24] *See, e.g., Gray Portland Cement and Clinker From Mexico*, *supra*, 64 Fed. Reg. at 13157.

[25] *See* QR 1 at A-13 (PD 13, Fiche 5, Frs. 20-21; CDoc 1, Fiche 13, Frs. 20-21).

[26] *See id*. at A-6 (PD 13, Fiche 5, Fr. 16; CD 1, Fiche 13, Fr. 16). *See also* Exhibit B-4 to Verification Memorandum dated 5/4/98, OBS 376 (CDoc Ex. B-4, Fiche 32, Frs. 5, 91) (indicating different weights for shipping and invoicing purposes.)

[27] *See also NSK Ltd. v. United States*, 190 F.3d 1321 (Fed. Cir. 1999) (different process of ordering or shipping are relevant to ordinary-course-of-trade inquiry.)

invoice. *See* Pls' Conf. Br. at 39-40 and attachment C thereto ("Agreed Supplement to the Record"); Pls' Conf. Rep. at 49-51 and attachment. *See also* Exhibit B-4 to Verification Memorandum dated 5/4/98, OBS 81 (CDoc Ex. B-4, Fiche 32, Fr. 12). Ausimont contends that the documentation of separately negotiated prices, orders canceled before invoicing, and the characterization and processing of orders as "pending" therefore show that the contested sales differed significantly from those of granular PTFE resin sales and were therefore unusual.

Alternatively, Ausimont contends the contested sales should be excluded from NV as not sold in the "usual commercial quantities"[28] because their average quantity was [    ] kilograms whereas the mean average quantity of other merchandise sold during the POI was [    ] kilograms. Pls' Br. at 41, referencing *Nachi-Fuijikoshi Corp.*, *supra*, 16 CIT 606, 798 F. Supp. 716.

*2. The Defendant's and Defendant-Intervenor's Arguments*.

The government responds that: (1) after passage of the Uruguay Round Agreements Act, Pub. L. 103-465, 108 Stat. 4809 (1994) ("URAA"), Commerce retained discretion to determine whether a sale is within or without the ordinary course of trade,[29] (2) wet reactor bead is properly subject to the antidumping order against granular PTFE resin, (3) Commerce was "well aware" of the differences between wet reactor bead and granular resin, and (4) Ausimont provided data on home market sales of wet reactor bead in response to Commerce's specific request to provide the home

---

[28] 19 U.S.C. § 1677(17) (1994) defines "usual commercial quantities" for "any case in which the subject merchandise is sold in the market under consideration at different prices for different quantities" to mean "the quantities in which such merchandise is there sold at the price or prices for one quantity in an aggregate volume which is greater than the aggregate volume sold at the price or prices for any other quantity."

[29] Def's Resp. at 25, stating *accord Mitsubishi Heavy Industries, Inc. v. United States*, 22 CIT 541, 568, 15 F. Supp.2d 807, 830 (1998).

market products and sales believed to be the "most appropriate" for comparison with imported wet reactor bead. Therefore, the government states, Commerce determined that the contested sales were an appropriate foreign like product for constructing export price sales of wet reactor bead. Def's Resp. at 20-25, 33-34; Def's Supp. Mem. at 9; DuPont's Resp. at 7-8. *See* QR 1 at Ex. B-2 (PDoc 13, Fiche 5, Fr. 94; CDoc 1, Fiche 15, Fr. 52); Letter enclosing updated U.S. and home market databases from Ausimont to Commerce of 12/19/97 at Ex. 1 (CDoc 3; Fiche 19, Fr. 38); Verification Memorandum dated 5/4/98 at Ex. A-3-1 (CDoc Ex. A-3-1; Fiche 26, Fr. 49). *See also* DuPont's ConApps 4, 5, 6.

As a general matter, the government maintains that there was no departure from agency practice in examination of the conditions and practices of the contested sales, that even if there were, Commerce is relieved of explaining any departure by virtue of *Allied-Signal Aerospace Co. v. United States*, 28 F.3d 1188 (Fed. Cir. 1994),[30] and that Ausimont only recited differences between the contested sales and PTFE granular resin sales but did not provide a "complete explanation of the facts which establish the extraordinary circumstances rendering particular sales outside the ordinary course of trade." Def's Resp. at 31-32, quoting *NTN Bearing Corp. of America*, *supra*, 19 CIT at 1229, 905 F. Supp. at 1090-91. DuPont adds that Ausimont has not met the "heavy" burden of proof for disregarding sales which was "set forth" in *Koyo Seiko Co., Ltd. v. United States*, *supra*, 20 CIT at 783-84, 932 F. Supp. at 1497-98 (claim that certain sales consisted of samples or obsolete product insufficiently substantiated by evidence of record,) and it points out that in *Mantex* there was an

---

[30] Def's Resp. at 31. The appellate court in *Allied-Signal* viewed the "nature" of "best information available" determinations as "discretionary, case-by-case" and concluded "Commerce is obligated only to use a methodology consistent with its statutory authority, and it is not required to supply a 'reasoned analysis' justifying its adoption." 28 F.3d at 1191.

"explanation" for the aberrational nature of the sales, namely the fact that the ASTM type pipe sold in India was packed for export and unstamped, lending credence to finding that those sales consisted of production overruns or returns on export sales. DuPont's Resp. at 16-17, 33; DuPont's Supp. Resp. at 6-7. *Compare Mantex*, *supra*, *with Certain Circular Welded Carbon Steel Pipes and Tubes From Thailand*, *supra*, 61 Fed. Reg. at 1331. *See also Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France et al.*, 58 Fed. Reg. 39729 (July 26, 1993) (Final Rev. Results) ("*Antifriction Bearings From France*").[31]

The government and DuPont argue that neither *CEMEX* nor *Mantex* compels exclusion of low-volume and infrequent sales, that in fact there are "numerous" instances where infrequent and low volume sales were considered ordinary, including *Murata Mfg. Co.*, *supra*, *NTN Bearing Corp. of America*, *supra*, and *NSK Ltd. v. United States*, 17 CIT 590, 596-97, 825 F. Supp. 315, 321 (1993). The government asserts that there is no authority for the proposition that volume and frequency are to be accorded "great weight" in ordinary-course-of-trade analyses, or that frequency and volume are determinative "in and of themselves" (despite *Gray Portland Cement and Clinker from Mexico*, *supra*, 65 Fed. Reg. 13943), and that the *Final Results* are in accordance with whatever

---

[31] In *Antifriction Bearings From France*, Commerce opined:

> Although respondent provided price comparison data for all of its sample and prototype sales, this data merely proves that such sales were made in smaller quantities at higher prices. Respondent has provided no information regarding the circumstances surrounding the sales alleged to be outside the ordinary course of trade. Therefore, FAG-Germany's data provides insufficient evidence in and of itself for proving that sample sales were made outside the ordinary course of trade.

58 Fed. Reg. at 39775

administrative practice may be gleaned from this area, including *Fresh Atlantic Salmon*. *See* Def's Resp. at 31-32, 37-38. DuPont contends that the volume of the contested sales was *not* insignificant, compared to "sales of many other PTFE products" and it points out that *Fresh Atlantic Salmon* involved the "much smaller absolute quantity" of only several thousand kilograms. DuPont's Resp. at 18-21. "Without more, Commerce could not conclude, as plaintiff would have liked, that the sizeable absolute amount of the PTFE reactor bead sales was comparable to a lesser amount of granular PTFE resin sales." *Id*. at 19.[32]

The government asserts that Commerce relies on both averaging and examination of ranges in analyzing ordinary course of trade claims, and that a party's preference for comparing aggregate averages does not mean that a determination "based on ranges" is unsupported by substantial evidence.[33] Def's Supp. Mem. at 15, referencing *Eckstrom Indus. Inc. v. United States*, 23 CIT ___,

---

[32] Ausimont responds that "several thousand kilograms" of fish fillets "probably is a lot of fish," at the same time maintaining that [ ] thousand kilograms of wet reactor bead sold in Italy was insignificant when compared to all granular resin sales. Pls' Rep. at 19.

[33] *See* Def's Supp. Mem. at 14-15, referencing *Steel Wire Rod From Canada*, 63 Fed. Reg. 9182, 9186 (Feb. 24, 1998) (Final Determ. LTFV) ("the price of the sale at issue is near the midpoint of the price range of Stelco's home market sales, and there is no evidence that the price was aberrational"); *Coated Groundwood Paper From France*, 56 Fed. Reg. 56380, 56383 (Nov. 4, 1991) (Final Determ. LTFV) ("because the quantities of these sales were within the typical range, and because there is no reason to believe that this was not the normal commercial practice for these sales prior to the POI, we do not believe that these sales fall outside the ordinary course of trade"); *Industrial Phosphoric Acid From Israel*, 52 Fed. Reg. 25440, 25443 (July 7, 1987) (Final Determ. LTFV) ("The sales price falls within the range of prices paid by other customers in the home market and, thus, we have included this sale in our foreign market value calculations.") *See also* DuPont's Supp. Mem at 3-4, referencing *inter alia Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al.*, 63 Fed. Reg. 33320, 33344 (June 18, 1998) (Final Rev. Results) ("regard[ing] NTN's abnormally high-profit sales, the presence of profits higher than those of other sales does not necessarily place the sales outside the ordinary course of trade"); *Sulfur Dyes, Including Sulfur Vat Dyes, From The United Kingdom*, *supra*, 58 Fed. Reg. at 3256 ("sale at a greater quantity and lower price than other sales to the same customer [and] . . . out of line with

___, 70 F. Supp.2d 1360, 1363-64 (1999) (recently reversed, *see* ___ F.3d ___, 2001 WL 737334 (Fed.Cir. 2001). Averaging analysis would be "immaterial" here, the government contends, because of *Consolo v. Federal Maritime Comm'n*, *supra*, 383 U.S. at 620 (possibility of drawing inconsistent conclusions from the same evidence does not necessarily render agency determinations unsupported by substantial evidence.) *See* Def's Resp. at 33-34.

The government demurs that it would be incorrect to state that Commerce's practice is to analyze ordinary course of trade claims by comparison to merchandise within the same "such or similar"[34] or "foreign like product" categories.[35] DuPont distinguishes *Calcium Aluminate Cement, Cement Clinker and Flux From France*, *supra*, and the like as merely concerned with comparison of sales for matching purposes in the context of the "hierarchical rules" of 19 U.S.C. § 1677(16) for determining "foreign like product" or "such or similar merchandise" which favor "[t]he subject merchandise and other merchandise which is identical in physical characteristics with, and that was

---

prices and quantities of the vast majority of respondents' other sales transactions in the home market",) and *Granular Polytetrafluoroethylene Resin From Japan*, *supra* 58 Fed. Reg. at 50345 ("extremely small quantities of [evaluation samples] at prices substantially higher than the prices of the vast majority of sales reported" excluded.)

[34] The URAA replaced "such or similar merchandise" with "foreign like product." *Compare* 19 U.S.C. § 1677(16) (1988) *with* 19 U.S.C. § 1677(16) (1994).

[35] Def's Supp. Resp. at 11, referencing *Gray Portland Cement and Clinker From Mexico*, 62 Fed. Reg. 17581, 17585-86 (Apr. 10, 1997) (Final Rev. Results) ("In the second review, the Department's determination that CEMEX's Type II and V sales were outside the ordinary course of trade hinged on a comparison between home market sales of Type I cement and Type II and V cement.") *See also Gray Portland Cement and Clinker From Mexico* , 63 Fed. Reg. 12764, 12771 (Mar. 16, 1998), which distinguished sales of Type II cement as outside the ordinary course of trade because 1) it was a specialty cement sold to a niche market, 2) shipping distances and freight costs were significant, and 3) there existed a "promotional quality" for Type II cement that did not exist for other types of cement.

produced in the same country by the same person as, that merchandise," and this it argues is a "different statutory mandate" than 19 U.S.C. § 1677(15). DuPont's Supp. Resp. at 10-11. Continuing, it posits that if Commerce's authority were restricted to type-to-type comparisons, there would be no basis to exclude particular sales within a type or model such as samples and product overruns, adding that while Commerce has exercised discretion to compare the attributes of sales of certain "types" of merchandise against the attributes of sales of other types, in other cases Commerce has chosen to make comparisons on an individual sale- or model-basis or in terms of ranges of sales, and that Commerce's only consistent practice in these cases is to conduct its ordinary course of trade analysis with respect to all home market sales of merchandise of the same class or kind as subject merchandise.[36]

Regarding prices and quantities, the government responds that Commerce correctly compared the conditions and practices of the subject merchandise to the conditions and practices of merchandise of the "same class or kind" and it argues Ausimont's arguments are unavailing because adjustments to account for such are available under 19 U.S.C. § 1677b(a)(6)(C)(ii). Def's Resp. at 34-35. *See* 19 U.S.C. § 1677(15). It further argues that the fact that certain PTFE "models" had higher profits than the contested sales validated that the latter were within the "normal" range of profits for sales of PTFE granular resin. Also, it points out that it was Ausimont's suggestion to compare gross rather than net profit, but whether net profit is more indicative of profitability it

---

[36] DuPont's Supp. Resp. at 9, referencing *Certain Corrosion-Resistant Carbon Steel Flat Products from Japan*, 64 Fed. Reg. 12951 (Mar. 16, 1999) ("The particular facts of this case do not support a finding that the sales to the customer at issue were extraordinary transactions in relation to other sales transactions. There is no record evidence demonstrating any significant distinction between the sales at issue and other home market sales"); *Polyvinyl Alcohol from Taiwan*, 61 Fed. Reg. 14064, 14068 (Mar. 29, 1996).

asserts Commerce has discretion to decide what circumstances render highly profitable sales extraordinary. *Id*. at 33, referencing *Mitsubishi Heavy Industries, Ltd.*, *supra*, 22 CIT at 568, 15 F. Supp.2d at 830.

Regarding Ausimont's argument on the absence of a "market" for wet reactor bead in Italy, the government argues that Ausimont's 1993-94 questionnaire response statements dispelled the notion that the contested sales were not as "unusual" as Ausimont suggested and "revealed" that in fact wet reactor bead sales were made "over time." Because the contested sales were (1) transacted with one of Ausimont's regular customers, who purchased granular PTFE resin as well, (2) within the range of profits for all of the company's resin sales, and (3) repeat occurrences, the government argues Commerce was justified in finding that the contested sales were "normal." Def's Resp. at 32. Again, it asserts the possibility of drawing two inconsistent conclusions from these facts does not mean that Commerce's conclusion is unsupported by substantial evidence. Def's Resp. at 35-36. DuPont adds that Commerce's view of products or sales in one proceeding has no bearing on whether particular transactions are outside the ordinary course of trade in a subsequent proceeding. DuPont's Resp. at 23, referencing *Koyo Seiko*, *supra*, 20 CIT at 783-84, 932 F. Supp at 1497-98.

The government states usage should not even be considered because Ausimont did not raise argument thereon in its administrative case brief. Def's Resp. at 32. DuPont, however, states that it is "incorrect" to assert that the use of wet reactor bead is dissimilar to granular PTFE resin because it contains all the latter's "essential" characteristics and can be "easily" transformed into the finished product, as Commerce concluded when it included wet reactor bead within the scope of the antidumping duty order against granular PTFE resin from Italy. DuPont's Resp. at 22.

Regarding the terms and conditions of the contested sales, the government insists Commerce did not have an opportunity at verification to explore the issue of differences between the contested sales and other sales since the documents gathered were not collected for that purpose and Ausimont did not raise the issue until after the preliminary determination. The government distinguishes the observation in *Murata* that sales canceled before invoicing are indicative of extraordinary sales as one of several leading to Commerce's determination. Def's Supp. Mem. at 17, referencing *Murata Mfg. Co.*, *supra*, 17 CIT at 263, 820 F. Supp at 606. DuPont emphasizes that the verified documents were inconclusive because "pending orders" are indistinguishable from "open orders" for granular PTFE resin since these are mere indications of intention to purchase a quantity of granular PTFE resin at a particular price but not commitment; it is only when the purchaser informs of the desired quantity that price is established and the invoice is prepared.[37] It points to Ausimont's responses to the first questionnaire that "[p]rices are negotiated on a case-by-case basis with individual customers" and "are made on a delivered basis".[38] *See generally* DuPont's Resp. at 25-26 & app. 13.

Responding to the "usual commercial quantities" facet of Ausimont's claim, the government and DuPont state it is Commerce's practice[39] to examine whether there is a clear correlation between

---

[37] *See* QR 1 at A-10-11 (PDoc 13, Fiche 5, Frs. 20-21; CDoc 1, Fiche 13, Frs. 20-21).

[38] *See id.* at A-6 (PDoc 13, Fiche 5, Fr. 16; CDoc 1, Fiche 13, Fr. 16).

[39] At least, prior to the URAA it was. *See Fabrique de Fer de Charleroi S.A. v. United States*, 22 CIT 6, 11, 994 F. Supp. 395, 399 (1998). *See e.g. Iron Construction Castings from Canada*, 56 Fed. Reg. 23274, 23276 (May 21, 1991); *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan*, 52 Fed. Reg. 30700, 30703 (Aug. 17, 1987) (Final Determ. LTFV).

price and quantity, that Ausimont first raised the issue in its administrative case brief, that Ausimont provided no such demonstration, and that even if the Court reaches the merits of the issue Ausimont has not demonstrated error in Commerce's conclusion. Def's Resp. at 40-43; DuPont's Resp. at 37-39. DuPont adds that even if evidence of price-quantity correlation had been provided, the contested sales were not unusual or unrepresentative of commercial sales quantities given the fact that [ ] home-market transactions of foreign like product were larger than the contested sales, [ ] exceeded [ ] thousand kilograms, and [ ] were in the [ ] to [ ] thousand kilogram range.[40]

**C**

The ultimate question is whether there is substantial evidence on the record to support Commerce's determination not to exclude the contested sales. The purpose of excluding extraordinary sales "is to prevent dumping margins from being based on sales which are not representative." *Monsanto Co. v. United States*, 12 CIT 937, 940, 698 F. Supp. 275, 278 (1988). By statute, "ordinary course of trade" is defined to mean the "conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind". 19 U.S.C. § 1677(15). Claims of extraordinary sales are concerned with what "ordinary course of trade" is not,[41] therefore

---

[40] DuPont's Resp. at 38, referencing QR 1 at Ex. B-2 (CDoc 1, Fiche 15, Fr. 53-87). *See* DuPont's ConApp. 4.

[41] 19 C.F.R. § 351.102(b) was the result of amendment to 19 C.F.R. § 353.46 (1996) "so as to emphasize the fact-specific nature of ordinary course of trade analysis" and conform to the URAA. 62 Fed. Reg. 27296, 27299 (May 19, 1997). International trade analysis *is* "fact specific," of course, but the regulation provides that sales outside the ordinary course of trade as those which "have characteristics that are extraordinary." Apart from that tautology, it also provides a non-exclusive list of examples, including merchandise that is "off-quality" or "produced according to unusual specifications" and transactions "at aberrational prices," or with "abnormally high profits" or

19 C.F.R. § 351.102(b) evinces a case-by-case approach to the problem which has been repeatedly sustained. *See*, *e.g.*, *NTN Bearing Corp. of America v. United States*, Slip Op. 01-76, 2001 WL 708718 (June 22, 2001); *NSK Ltd. v. United States*, Slip Op. 01-69, 2001 WL 630967 (June 6, 2001); *Torrington Co. v. United States*, 25 CIT ___, 146 F. Supp. 2d 845 (2001); *Bergerac, N.C. v. United States*, 24 CIT ___, 102 F. Supp. 2d 497 (2000).

In general, Ausimont criticizes the *Final Results* for analyzing each factor in isolation and from the perspective of whether the particular factor alone was so unusual as to render the contested sales outside the ordinary course of trade. If that is on the mark, that would not be in accordance with the "totality of the circumstances standard" enunciated in 19 C.F.R. § 351.102(b). Each relevant factor must, nonetheless, be considered.

Commerce agreed that volume and frequency represented small percentages but concluded that the fact that their absolute amount was "larger on average than for other sales" was more important (*i.e.* "not insignificant".) The Court disagrees with Ausimont's theory that it was inconsistent to consider an absolute amount not insignificant in the analysis of volume but consider the same fact not significant when analyzing quantity. These are different perspectives, not polar opposites, and analysis of volume may be effected by frequency. Broadly speaking, examination of absolute amounts in addition to (or, possibly, as substitute for) relative volume would not be *per se* inconsistent with Commerce's statutory mandate, and Commerce has "discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or

---

"unusual terms of sale," or "to an affiliated party at a non-arm's length price," and in the final analysis a determination must be "based on an evaluation of all of the circumstances particular to the sales in question." 19 C.F.R. § 351.102(b).

piece of evidence," *Maine Potato Council v. United States*, 9 CIT 293, 300, 613 F. Supp. 1237, 1244 (1985), however an absolute value has no inherent significance: it is the *context* of an observation which confers its significance. *Cf. USX v. United States*, 11 CIT 82, 85, 655 F. Supp. 487, 490 (1987) ("it is the *significance* of a quantity of imports, and not absolute volume alone, that must guide ITC's analysis under section 1677(7)") (emphasis in original.) Of course, the context itself must be meaningful.[42] Elsewhere, Commerce has stated that examination of *relative* volume and frequency is a "long-standing practice."[43] Here, however, Commerce offered only the observation that the contested sale amounts were larger on average than other sales, without explanation for the necessity of adopting a different approach to considering volume and frequency and little further elaboration. In light of the fact that the contested sales' frequency was less than one half of one

---

[42] *See*, *e.g.*, *Canned Pineapple Fruit From Thailand*, *supra*, 60 Fed. Reg. at 29562-63 ("Dole's single third country sale of this product constituted an insignificant portion of its total German sales volume".) *Cf. USX v. United States*, 11 CIT 82, 85, 655 F. Supp. 487, 490 (1987) (rejecting ITC's analysis of market penetration data which consisted solely of the statement that levels of market penetration remained low and stable, without discussion of the significance of this trend or its relationship to other facts uncovered in the investigation); *Federal Mogul Corp. v. United States*, 20 CIT 234, 261-263, 918 F. Supp. 386, 410-11 (1996) (congressional silence on "significant" content of further-manufactured imports and application of the Roller Chain rule.) On this point, Commerce's own practice appears to indicate awareness. *See*, *e.g.*, *Fresh Tomatoes From Mexico*, 61 Fed. Reg. 56608, 56610 (Nov. 1, 1996) (Prelim. Determ. LTFV) (discussion on targeted dumping); *Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Japan*, 61 Fed. Reg. 38139, 38162 at Comment 12 (July 23, 1996) (Final Determ. LTFV). But, on whether there is substantial evidence to uphold a determination that an absolute amount of wet reactor bead sold was "not insignificant," the Court has been requested to contemplate the matter under the "significance" of the weight of dead fish from *Fresh Atlantic Salmon*, a prospect few would relish, if any.

[43] Decision Memorandum, *Gray Portland Cement and Clinker From Mexico*, *supra*, 65 Fed. Reg. 13943. Indeed, Commerce apparently considers volume and frequency of such import that under certain conditions they prove sales are unusual, obviating consideration of other factors, although that would appear to be the exceptional situation. *Compare id. with*, *e.g.*, *NTN Bearing Corp. of America v. United States*, 23 CIT ___, ___, 83 F. Supp. 2d 1281, 1288 (1999).

percent and their volume approximately 2.0 percent of home market sales, the reader is left wondering what is significant about the fact that they are larger on average than "other sales," even assuming the *Final Results* are read to mean "all" or "most." *Cf. Rautaruukki Oy v. United States*, Slip Op. 99-39, 1999 WL 270028 (1999); *Rautaruukki Oy v. United States*, 22 CIT 786, 790, 1998 WL 465219, at \*3 ("neither must the court regard as substantial evidence seemingly nominal differences in chemical composition, the significance of which Commerce has not explained.")[44]

The government contends that because ordinary course of trade determinations are case-by-case, Commerce did not have to explain further in light of *Allied Signal*. Such an interpretation must be rejected. A reviewing court must understand the basis of the agency's action in order to be able to judge the consistency of that action with the agency's general mandate. *See Chennault v. Department of the Navy*, 796 F.2d 465 (Fed. Cir. 1986).[45] *Allied Signal* neither disturbs the well-established principle that an agency must articulate a "rational connection between the facts found and the choices made," *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962), nor relieves Commerce from explaining any departure from "established" agency practice. *See Atchison,*

---

[44] Regarding volume, *cf. also Craig v. Boren*, 429 U.S. 190, 201-202 (1976) ("if maleness is to serve as a proxy for drinking and driving, a correlation of 2% must be considered an unduly tenuous 'fit'.") The Court also finds it of interest that Commerce normally requires foreign like product sales of 5% of the aggregate quantity or value of U.S. subject merchandise sales in order to find a "viable" overseas market for comparison purposes. *See* 19 C.F.R. § 351.404(b).

[45] Furthermore, if a reviewing court cannot connect the dots between the agency's considered factors and the action taken, the agency's determination may be considered arbitrary or capricious. *See*, *e.g.*, *Consolidated Bearings Co. v. United States*, Slip Op. 01-66, 2001 WL 607015, \*8 (June 5, 2001); *Sanyo Electric Co., Ltd. v. United States*, 23 CIT ___, ___, 86 F. Supp. 2d 1232, 1239 (1999); *The Humane Society of The United States v. Clinton*, 23 CIT ___, ___, ___, 44 F. Supp. 2d 260, 269, 277 (1999); *NTN Bearing Corp. of America v. United States*, 19 CIT 1165, 1170, 903 F. Supp. 62, 67 ( 1995); *Sugiyama Chain Co., Ltd. v. United States*, 19 CIT 328, 333, 880 F. Supp. 869, 873 (1995).

*Topeka & Santa Fe Railway Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1971). The apparent administrative preference being analysis of relative volume and frequency, not absolute amount, the matter will be remanded for consideration therefor or explanation why such would be insufficient.

There also appear to be flaws in the *Final Results* in the analyses on quantity, price, and profit. Ausimont argued that average quantities five times that of granular PTFE resin cannot be considered "normal"for this other type of PTFE. In dismissing this proof, Commerce stated there was an insufficient basis in the record for determining whether "this difference" in quantity "is in fact attributable to circumstances rendering the sales in question extraordinary or unrepresentative of normal sales."[46] On the one hand, this reasoning appears circular: to show extraordinary sales Commerce required Ausimont to prove significantly different quantities, but to prove the quantities significantly different, Ausimont was, in effect, required to prove that the sales were extraordinary or unrepresentative. Whether the reason for a difference is indiscernible, that does not negate the degree of the difference itself, which must be considered in the context of the totality of the circumstances unless the comparison is inappropriate. On the other hand, there were no other home market sales of wet reactor bead for comparison purposes, and Commerce may have regarded the quantitative comparisons through the prism of granular PTFE resin sales and questioned the assumption of *ceteris paribus* ("all other things being equal.") Certainly it did so with respect to Ausimont's comparison on price, which was dismissed on the ground that wet reactor bead and granular PTFE resin are different products for which there is no reasonable expectation of similar

---

[46] The *Final Results* also state that "the fact that home market sales of wet reactor bead were made in quantities higher than average does not support a conclusion that a normal value based on the price of such sales would be unreasonably high." If this was not intended to set an even higher standard for Ausimont to surmount, it is either a *non sequitor* (at best) or it is jumping the gun.

selling prices. Such logic should apply across the board, yet Commerce contradicted, by considering the "range" of the contested sale quantities not "so unusual as to render such sales inappropriate for our analysis,"[47] and by observing higher profits on certain models of granular PTFE in order to negate the degree of disparity in profits for the contested sales as a whole.[48] If *ceteris paribus* does not hold, then the fact that an observation falls within the range of a given "normal" population is doubtful, since the comparison is questionable.[49] But if comparison of different product types is appropriate and meaningful in considering whether sales were extraordinary, then it was unreasonable to dismiss Ausimont's comparison on the ground that wet reactor bead and granular PTFE resin are different products for which there is no reasonable expectation of similar selling prices.

---

[47] Again, determining whether a fact is significant or insignificant is precisely the agency's fact finding function, *Maine Potato Council v. United States*, 9 CIT at 300, 613 F. Supp. at 1244, but the reader should not be left wondering what measure was employed therefor. Also, in framing the ordinary-course-of-trade provision, Commerce expressly rejected the suggestion that all sales should be presumed ordinary. *See Antidumping Duties; Countervailing Duties*, *supra* 62 Fed. Reg. at 27299. Notwithstanding the burden of proof on Ausimont, a standard which requires a claimant to "render such sales inappropriate to use such sales in the analysis" presumes precisely that.

[48] Commerce also rejected, apparently, Ausimont's profit comparison on the ground that "the identification of sales as having high profits does not necessarily render such sales outside the ordinary course of trade." 63 Fed. Reg. at 49082 (citation omitted). That may be true as a general statement, *see*, *e.g.*, *Torrington Co. v. United States*, *supra*, Slip Op. 01-56 (May 10, 2001) at 21, 146 F. Supp. 2d at ___ (2001 WL 501205 at *7), but if offered as justification it is evasive. Under the totality of the circumstances, high profitability can be probative on whether sales were outside the ordinary course of trade. *See CEMEX, S.A. v. United States*, 133 F.3d at 901. The inquiry should be focused on the degree of profitability involved as compared with what is considered "normal in the trade under consideration with respect to merchandise of the same class or kind". 19 U.S.C. § 1677(15).

[49] Furthermore, formal logic holds that "if A, then C" is *not* the same as "if C, then A," unless the two are proven to be reflexive of one another. *See Wells Fargo & Company And Subsidiaries v. Commissioner of Internal Revenue*, 224 F.3d 874, 882 (8th Cir. 2000).

In order to know what is extraordinary, one must obviously know what is ordinary. In accordance with administrative and judicial precedent, Ausimont pointed to statistical proofs showing that the contested sales were in greater quantities, lower prices, and higher profits than the "vast majority" of "ordinary" merchandise. *See*, *e.g.*, *Thai Pineapple Public Co.*, *supra*. *See also supra*, note 15. Ausimont deduced that when considered as a part of the "totality of the circumstances" such proofs tended to show that the contested sales are extraordinary. The parties dispute whether the demonstrated degrees of difference between wet reactor bead and granular PTFE resin contribute to the resolution of that issue. At a minimum, the comparisons highlight the degrees of difference between wet reactor bead and granular PTFE resin, and from the parties arguments it appears there is implicit agreement that wet reactor bead and granular PTFE resin are not equivalent products: they are distinct types of PTFE. The government and DuPont defend type-to-model comparisons but acknowledge Commerce was "well aware" of the differences between wet reactor bead and granular PTFE resin, and the *Final Results* indicate reliance on such differences to dispute the validity of aggregate quantitative comparisons. The differences between the products may not be those of apples and oranges, but they are at least as pronounced as those of apples and applesauce. *Cf. Calcium Aluminate Cement, Cement Clinker and Flux From France*, *supra*.[50] However the

---

[50] Considering the parties arguments on *Calcium Aluminate Cement, Cement Clinker and Flux From France*, the fact that the determination is concerned with § 1677(15) and not § 1677(16) is immaterial. To disclaim authority for distinguishing wet reactor bead from granular PTFE resin because of a "clear preference" for price-to-price comparison and the "heirarchical rules" in § 1677(16), if that is the argument, is to put the cart before the horse: the determination of NV and the appropriate "foreign like product" is premised on sales which were made in the ordinary course of trade. *See* 19 U.S.C. § 1677b(a)(1)(B)(i). Commerce's discretion in the appropriate selection of foreign like product, s*ee Koyo Seiko*, 66 F.3d 1204 (Fed. Cir. 1995), is not in doubt.

disagreement is resolved,[51] sales must be examined for what they are, whether or not there is formal division into distinct foreign like product categories or aggregate data analysis. In the Court's opinion, the *Final Results* fall short of appropriate and full consideration of such differences or adequate reasoning why such would not be meaningful, and it is therefore necessary to remand the matter for further reflection.

Commerce also rejected Ausimont's usual-commercial-quantities claim for the same reasons it rejected Ausimont's arguments on quantity in the context of the ordinary-course-of-trade claim, not on the basis of a failure to demonstrate a price-quantity correlation. Because it is necessary for Commerce to reconsider quantity in accordance with the foregoing, this issue will also be remanded for reconsideration. The Court further notes Ausimont's assertion that since passage of the URAA, Commerce has excluded unusual-commercial-quantity sales without reference to price-quantity correlation. Pls' Supp. Rep. at 23-24, citing *Steel Wire Rod From Canada*, *supra*, 63 Fed. Reg. 9182; *Pure and Alloy Magnesium from Norway*, 57 Fed. Reg. 30942 (July 13, 1992) (Final Neg. Determ.); *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From The Federal Republic of Germany*, 56 Fed. Reg. 31692 (July 11, 1991).

In considering the "market" for the subject merchandise and "merchandise of the same class or kind," whether an importer has made sales in the ordinary course of trade depends upon whether the importer made the sales under conditions that are normal for the product being sold, not whether

---

[51]  Ausimont points out that the government "conceded" that Commerce analyzes different product types by comparing variable differences on the basis of aggregate sales. Pls' Supp. Mem. at 17, referencing *Gray Portland Cement and Clinker From Mexico*, *supra*, 62 Fed. Reg. at 17587; *Pipes From India*, *supra*. In any event, Commerce must correct and, as necessary, clarify the *Final Results* in accordance with this opinion and consistently with administrative practice.

the importer ordinarily sells the merchandise. *East Chilliwack Fruit Growers Co-operative v. United States*, 11 CIT 104, 108, 655 F. Supp. 499, 504 (1987). Minimal sales or demand may be probative on the market conditions for a product, *e.g. Thai Pineapple Public Co.*, *supra*, and market conditions may be inferred from the record evidence. *Mantex*, *supra*, 17 CIT at 1405, 841 F. Supp at 1307. The presence of demand does not necessarily indicate a meaningful market. *Gray Portland Cement and Clinker From Mexico*, *supra*, 64 Fed. Reg. at 13157.

It is noted, as DuPont asserts, that Commerce's view of products or sales in one proceeding might have little bearing on whether particular transactions are outside the ordinary course of trade in a subsequent proceeding. *See Heveafil Sdn. Bhd. v. United States*, Slip Op. 01-22 at 26, 2001 WL 194986 at *11, note 12 (Feb. 27, 2001)[52] ("It is well established that Commerce may change its position as long as it provides adequate explanation for such a change.") (citations omitted.) However, the inquiry must take into account the conditions and practices which have been normal in the trade under consideration with respect to merchandise of the same class or kind "for a reasonable time prior to the exportation of the subject merchandise," 19 U.S.C. § 1677(15), and the circumstances of a particular case will determine what is a "reasonable" time prior to the exportation of the subject merchandise. The *Final Results*' rationale was that "Ausimont's claim regarding the absence of past home market sales of this merchandise focuses entirely on the immediately prior review, without addressing the fact that the respondent has in fact sold wet reactor bead in the home market in previous *segments* of this proceeding." 63 Fed. Reg. at 49082 (highlighting added).

---

[52] *See also Koyo Seiko*, *supra*, 20 CIT at 784, 932 F. Supp at 1498; *Cultivos Miramonte S.A. v. United States*, 21 CIT 1059, 1064, 980 F. Supp. 1268, 1274 (1997); *Citrosuco Paulista, S.A. v. United States*, 12 CIT 1196, 1209, 704 F. Supp. 1075, 1088 (1988).

Commerce paints with too broad a brush: the record shows wet reactor bead was previously sold only during the 1993-94 segment. Furthermore, whether Commerce was attempting to support finding the existence of a market or merely refuting Ausimont's contention that there was no market, it had to stretch back across four segments and five years for such. Nonetheless, the government and DuPont urge that it was reasonable to conclude that the market for the contested sales was "significant" because these were repeat occurrences to one of Ausimont's regular customers.

Under different circumstances the argument might prevail, however in *Canned Pineapple Fruit From Thailand* it was the fact that a single customer was involved which was determined controlling. The fact that the customer was regular was not. *See Thai Pineapple Public Co.*, *supra*, 20 CIT at 1315, 946 F. Supp. at 16. *See also* 60 Fed. Reg. at 29563. In view of the similarity of circumstances to that instance, it was unreasonable to reach a contrary determination here without further explanation or appropriate differentiation. Moreover, Commerce observed that in the 1993-94 circumvention proceeding, similarly, Ausimont reported it "produces and sells PTFE wet reactor bead to home-market customers in Italy." 63 Fed. Reg. at 49082 (citation omitted). There were two such sales in Italy at that time, which Commerce determined constituted "virtually no market," with the result that Commerce relied on cost of production data to determine that the difference in value between wet reactor bead imported into the United States and U.S. sales of granular PTFE resin was "small." *See* note 23, *supra*. For this POR, Ausimont reported, similarly, three home market sales of wet reactor bead. Using frequency as a guide, there is "virtually" no difference between this number and those considered in the 1993-94 segment. Accordingly, consideration of market must be remanded for similar treatment or adequate further explanation.

The last factor for consideration is Ausimont's argument on the fact that the terms of and conditions for the contested sales were different. In the *Final Results*, Commerce agreed that the documentation of the contested sales it had collected during verification showed different terms of sale for wet reactor bead and for granular resin. Nevertheless, it avoided consideration of those differences on the ground that it "did not examine or collect these exhibits for this purpose and Ausimont officials did not discuss such differences at verification." 63 Fed. Reg. at 49082. Thus, Commerce stated it was unable to conclude from the documentation that the terms of sale for wet reactor bead "generally differed significantly" from finished granular PTFE resin "or that different terms of sale are not generally applicable to all sales." *Id.*

Ausimont argues that this is insufficient, because Commerce was required to verify the terms of trade for granular PTFE resin, which it did by selecting what it considered was a representative sample of five sales. To the extent the argument addresses the apparent procedural barrier to consideration erected by Commerce, the Court agrees. The comparison of terms and conditions between products sold in the U.S. and foreign markets is essential to the dumping inquiry. *See Federal-Mogul Corp. v. United States*, 63 F.3d 1572, 1575 n.1 (Fed. Cir. 1995), quoting Joseph E. Pattison, *Antidumping and Countervailing Duty Laws*, § 1.02[1] (1994). Furthermore, Commerce is required to "verify *all information* relied upon in making . . . a final determination in a review under [19 U.S.C.] section 1675(a)." 19 U.S.C. § 1677m(i) (1994) (highlighting added). Commerce may use averaging and statistically valid samples and has exclusive authority in the selection thereof, *see* 19 U.S.C. § 1677f-1 (1994), and for its purposes it chose five granular PTFE resin sales for verification. It thereby verified the terms and conditions of granular PTFE resin sales in Italy.

At a minimum, Commerce's response to Ausimont's argument indicates comparison of wet reactor bead and granular PTFE resin terms and conditions was appropriate to the inquiry. The *Final Results* state Commerce did not examine or gather documentation "for this purpose." The Court does not interpret Commerce's statement as disavowal of verification of the terms and conditions for wet reactor bead and granular PTFE resin sold in Italy, since the purpose for seeking the documentation matters not, and the hierarchy of 19 U.S.C. § 1677(16) does not authorize relaxation of agency inquiry into the terms and conditions of wet reactor bead and granular PTFE resin sold in Italy, *i.e.* the "hierarchical rules" would only matter post-verification. If clarification of the terms and conditions for any of the examined sales was necessary, that is the purpose of verification, but if there were matters pertaining to the alleged differences between the wet reactor bead sales and granular PTFE resin sales in Italy into which Commerce would have required clarification from officials at Ausimont's Bollate facility, neither the government nor DuPont offered further explanation, and the Court will not speculate. Hence, the rationale in the *Final Results* cannot be sustained, since they are unsupported by substantial evidence on the record, and there appears no basis for not proceeding to consider the differences of terms of trade on the basis of the documentation in the record. This matter will therefor be remanded to Commerce.

Whether the terms and conditions for the contested sales can be said to be "unusual", *see* 19 C.F.R. § 351.102(b), such that they support concluding that the contested sales were extraordinary would depend, again, upon what is usual or unusual in the market for the product(s) in question. *Cf. East Chilliwack Fruit Growers Co-operative*, *supra*, 11 CIT at 108, 655 F. Supp. at 504. As discussed above, the "market" for wet reactor bead may be in doubt, but the Court notes that

"unusual" terms and conditions have included cancellation of orders. *See Murata Mfg. Co.*, *supra.*

Ausimont directs attention to the facts that the contested sales were on a "pending" order versus an

"open" order basis and that it cancelled part of a sale and that prices for wet reactor bead are adjusted

to reflect their dry weight and that prices for wet reactor bead in Italy were not "standard" but were

separately negotiated and so forth, but it is for Commerce to decide, at this point, what impact or

weight such considerations have in the analysis.

## II

Ausimont's second claim concerns the correct amount of statutory profit to allocate to the

importations of subject merchandise. In the *Final Results*, Commerce explained that its calculation

of CEP profit is consistent with its statutory interpretation of "total United States expenses" and

administrative practice. *Final Results* at 49083-49084, referencing *Canned Pineapple Fruit from*

*Thailand: Final Results of Antidumping Duty Administrative Review*, 63 Fed. Reg. 7392, 7395 (Feb.

13, 1998); *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From*

*France et al.*, 62 Fed. Reg. 2081, 2127 (Jan. 15, 1997) (Final Rev. Results). *See* 19 U.S.C. §

1677a(f) (1994).

All of Ausimont's U.S. sales of subject merchandise required the use of CEP, a calculation

which approximates *ex* factory price by taking the first arm's length U.S. selling price and reducing

it by:

> (1) the amount of any of the following expenses generally incurred by
> or for the account of the producer or exporter, or the affiliated seller
> in the United States, in selling the subject merchandise (or subject
> merchandise to which value has been added)--

(A) commissions for selling the subject merchandise in the
United States;

(B) expenses that result from, and bear a direct relationship
to, the sale, such as credit expenses, guarantees and
warranties;

(C) any selling expenses that the seller pays on behalf of the
purchaser; and

(D) any selling expenses not deducted under subparagraph
(A), (B), or (C);

(2) the cost of any further manufacture or assembly (including
additional material and labor), except in circumstances described in
subsection (e) of this section; and

(3) the profit allocated to the expenses described in paragraphs (1)
and (2).

19 U.S.C. § 1677a(d) (1994). The statutory profit ("CEP profit") in subsection (3) is described at

19 U.S.C. § 1677a(f), and is determined by multiplying "total actual profit" by the "applicable

percentage," which is the ratio of "total United States expenses" to "total expenses".[53] 19 U.S.C §

1677a(f)(1) (1994). "Total United States expenses" are defined at 19 U.S.C. § 1677a(f)(2)(B) as "the

total expenses described in subsection (d)(1) and (d)(2)" above, and "total expenses" are defined as

all expenses in the first of the following categories which applies and which
are incurred by or on behalf of the foreign producer and foreign exporter of
the subject merchandise and by or on behalf of the United States seller
affiliated with the producer or exporter with respect to the production and
sale of such merchandise:
(i) The expenses incurred with respect to the subject merchandise sold
in the United States and the foreign like product sold in the exporting country

---

[53] The calculation of CEP profit depends upon data submitted by the respondent in the CV
or COP database. Where a respondent is not required to submit CV or COP information, Commerce
relies on expense and profit information derived from the respondent's financial reports.

> if such expenses were requested by the administering authority for the purpose of establishing normal value and constructed export price.

19 U.S.C. § 1677a (f)(2)(C).

The term "total actual profit" is defined as:

> the total profit earned by the foreign producer, exporter, and affiliated parties described in subparagraph (C) [above] with respect to the sale of the same merchandise for which total expenses are determined under such subparagraph.

19 U.S.C. § 1677a (f)(2)(D).

The foregoing may be restated as follows, a formula to which Commerce adheres:

$$\text{CEP Profit} = \text{Total Actual Profit} \times \frac{\text{Total U.S. (Selling) Expenses}}{\text{Total Expenses}}$$

The calculation of CEP profit is a two-step process. *See generally* Import Administration Policy Bulletin 97/1 (Sep. 4, 1997). When calculating "total actual profit," Commerce essentially subtracts "total expenses" from total global revenues (net of rebates and discounts) for subject merchandise and foreign like product based on aggregation of per-unit information. Commerce calculates "total expenses" as the sum of "cost of merchandise," "selling expenses," and "movement/packing costs" for the U.S. and comparison markets. "Cost of merchandise" is treated as the sum of manufacturing, general and administrative expenses, and includes actual (global) net interest expenses derived from a respondent's CV database (in the case of subject merchandise) and COP database (in the case of foreign like product.) The total U.S. and comparison market "selling expenses" include direct and indirect selling expenses and any further manufacturing costs incurred in the United States. At this stage, however, "selling expenses" take no account of imputed credit expenses and inventory carrying costs. *Id.*

Having calculated "total actual profit," the "applicable percentage" is calculated based on the same "total expenses" which were calculated in accordance with the foregoing (*i.e.*, it includes actual global net interest expenses,) but at this stage, Commerce requires the addition of imputed credit and inventory carrying cost expenses in the calculation of "total United States expenses," the numerator of the CEP profit ratio.[54]  In other words, total U.S. "selling expenses" mean different things at the different stages of the CEP profit calculation.  The reason, Commerce generally offers, is because the calculation of "actual profit" takes into account "actual interest. " *Id.  See id.* at n.5.

Ausimont's complaint is that including imputed credit expenses and inventory carrying costs in the "total United States expenses" numerator but not in the "total expenses" denominator artificially inflated the CEP profit allocated to each U.S. sale.  The government counters that interest expenses actually incurred are already included in the denominator, and therefore to include imputed expenses in the denominator would be double counting.  Def's Resp. at 48, referencing *Certain Cold-Rolled Carbon Steel Flat Products From the Netherlands*, 62 Fed. Reg. 18476, 17479 (Apr. 15, 1997) (Final Rev. Results).  The government states Commerce's position is predicated upon the Statement of Administrative Action, H.R. Rep. No. 103-826 at 656 (1994) ("SAA"), which accompanied the URAA (p. 825):

> total profit is calculated on the same basis as the total expenses . . .[and n]o distortion in the profit allocable to U.S. sales is created if total profit is determined on the basis of a broader product-line than the subject merchandise, because the total expenses are also determined on the basis of

---

[54]  Commerce also considers that: [f]rom a computer programming standpoint, it may be easier and more efficient to compute the amount of CEP profit using a single ratio of total actual profit to total actual expenses [which] . . . would then be applied to ['total United States expenses'.]" Import Administration Policy Bulletin 97/1 n.6 (Sep. 4, 1997). *Cf. Final Results* at 49084 ("applying this rate to a U.S. selling expense pool inclusive of [imputed] expenses".)

the same expanded product line. Thus the larger profit pool is multiplied by a commensurately smaller percentage.

Ausimont relies for support on *Thai Pineapple Canning Industry Corp., Ltd. v. United States*, Slip Op. 99-42, 1999 WL 288772 (1999), however the rationale for the decision was derived from *U.S. Steel Group–A Unit of USX Corp. v. United States*, 22 CIT 670, 15 F. Supp. 2d 892 (1998), which was recently reversed by the Court of Appeals for the Federal Circuit ("CAFC"). *See U.S. Steel Group–A Unit of USX Corp. v. United States*, 225 F.3d 1284 (Fed. Cir. 2000). The CAFC found ambiguity in 19 U.S.C. § 1677a(f)(2), applied *Chevron* "deference"[55], and found the inclusion of movement expenses in "total expenses"a "permissible" construction of the statute. *U.S. Steel Group–A Unit of USX Corp. v. United States*, 225 F.3d 1284, 1292 (Fed. Cir. 2000). Of interest is the point that the appellate judges regarded 19 U.S.C. § 1677a as equating "total expenses" with "all expenses," yet found that the statute's "plain language and structure"[56] undercut this court's interpretation of the ratio of "total U.S. expenses" to "total expenses" as requiring symmetry as a matter of mathematical logic. That would appear, likewise, to undercut Ausimont's argument here.

---

[55] In reviewing an agency's construction of a statute that it administers, if "Congress has directly spoken to the precise question at issue," then a reviewing court and the agency "must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc. v. United States*, 467 U.S. 837, 842-43 (1984). If Congress has not directly spoken on the issue, a reviewing court must inquire whether the agency's interpretation "is based on a permissible interpretation of the statute" and, if so, defer to it. *Id*.

[56] Aside from ambiguity, the CAFC will apply *Chevron* deference to agency statutory construction but reviews this court's statutory interpretation without deference. 225 F.3d at 1286, citing *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1570 (Fed. Cir. 1994). *Compare U.S. Steel Group–A Unit of USX Corp. v. United States*, 225 F.3d 1284, 1290 (Fed. Cir. 2000), *with id.*, 22 CIT 670, 676, 15 F. Supp. 2d 892, 896 (1998).

Furthermore, in this court's prior examination of the remand results from Commerce, although it accepted the plaintiff's comment that "the manner of calculating U.S. imputed interest expenses may result in some cases in amounts which are not fully reflected in the total interest expenses figure which is used in the denominator of the CEP profit ratio," it also accepted the government's avoidance-of-double-counting theory. *Thai Pineapple Canning Industry Corp., Ltd. v. United States*, Slip Op. 00-17 at 19-20, 2000 WL 174986 at *6 (Feb 10, 2000). The court further considered that the plaintiff could not establish that the applicable percentage in that case was in fact distorted, for example (and without implying that these are actually distortive) because of "differing expenses over time" or "no or little actual U.S. interest expenses, but only imputed U.S. expenses," *id*., and such reasoning would apply here as well. The record does not appear to support a finding in favor of Ausimont. *Cf*. A-6 (PD 13, Fiche 5, Fr. 16; CD 1, Fiche 13, Fr. 16) (warehousing); Letter enclosing updated U.S. and home market databases from Ausimont to Commerce of 12/19/97 (CDoc 3, Fiche 14, Frs. 97-98, Fiche 15, Frs. 2, 5, 7-8) (financial statements.)

Ausimont also argues that imputed credit expenses and inventory carrying costs (included in "total United States expenses") and global net interest expenses (included in "total expenses") are different *categories* of expenses calculated using different rates of interest, time periods, and product values. Global net interest expenses are actual interest expenses associated with total operations in the U.S., comparison and third-country markets and are computed by allocating consolidated actual interest expenses reported on company's financial statements (*i.e.* the sum of short- and long-term borrowing expenses) to production activities in the U.S. and comparison markets. By contrast, imputed credit expenses and inventory carrying costs are calculated based on receivable periods,

short-term borrowing rates, gross unit prices, inventory values, and holding periods. In other words, Ausimont argues, they are opportunity costs not reflected in the financial statements but are associated, *ipsi dixit*, with selling to activities in the United States and comparison markets. Pls' Rep. at 57-59 and n.27. *See* 19 U.S.C. § 1677a(d)(1)(C) (1994). Ausimont's contends that in the "real world," the common business practice is to delay payment to vendors in order to offset delayed payments from purchasers such that the "opportunity costs" are associated with selling activities only in theory, not in reality. Pls' Rep. at 60 and n.28, (citations omitted). Therefore, Ausimont contends the implication that opportunity costs "result" in increased short-term borrowings or delayed retirement of debt, *see* DuPont's Resp. at 41,[57] is not, necessarily, true in a well-managed company, and certainly not with respect to Ausimont itself. "Simply put, the time value of money applies equally to money flowing in and money flowing out," Ausimont argues, and from this it concludes that Commerce's assertion that the actual interest expenses in the denominator of the CEP profit ratio somehow represent or capture the imputed expenses in the numerator "is without merit". Pls' Rep. at 60.

---

[57] In *Thai Pineapple Canning Industry, Ltd*., the government also argued:

> The annual interest expense incurred by a company, and reported as an element of COP/CV, will reflect the extent to which the company does not immediately receive payment upon production of the merchandise, *i.e.*, the opportunity cost of having the merchandise sit in inventory prior to sale, and of extending credit after the sale. To the extent that a company incurs a longer waiting period between production and payment, it will not have recourse to such funds and will generally incur greater financial expenses relative to receiving payment immediately upon production.

Slip Op. 00-17 at 18 n.11, 2000 WL 174986 at *6.

Ausimont's real bone of contention appears to be the administrative practice of imputing expenses at all. *See Silver Reed America, Inc. v. United States*, 12 CIT 39, 679 F. Supp. 12, *reh'g granted*, 12 CIT 250, 683 F. Supp. 1393 (1988). Since U.S. trade law apparently requires the capture of imputed expenses, 19 U.S.C. § 1677a(d)(1)(B) (1994); *cf. U.S. Steel Group*, *supra*, 225 F.3d at 1290, cash management may be argument for offsetting imputed expense with imputed income prior to inclusion in the determination of "total U.S. expenses," however that issue is not ripe for consideration in this matter.

### *Conclusion*

For the foregoing reasons, the matter will be remanded to Commerce for reconsideration of whether the home market sales in Italy of wet reactor bead were outside the ordinary course of trade. Commerce's calculation of CEP profit for the subject merchandise is sustained.

_____
R. KENTON MUSGRAVE, JUDGE

Dated: August 2, 2001
        New York, New York